Todd E. Zenger (5238)
DUREN IP
610 E. South Temple Street, Suite 300
Salt Lake City, Utah 84102
Phone: (801) 869-8538
Email: tzenger@durenip.com
Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF UTAH

| | |
|---|---|
| CRIMINAL PRODUCTIONS, INC., | Civil Action No. 2:17-cv-00550-DN |
| Plaintiff, | Judge David Nuffer |
| vs. | RESPONSE TO ORDER TO SHOW CAUSE: |
| DOES 1-32, | BRIEF 3 RE STATE OF CASE LAW RE CONTRIBUTORY INFRINGEMENT |
| Defendants. | |

Plaintiff Criminal Productions, Inc. submits this response brief to the Order to Show Cause to present a review of exemplary case law regarding contributory infringement in similar cases.

**A. United States Supreme Court**

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster*, 545 U.S. 913 (2005):

Respondent companies distributed free software that allow computer users to share electronic files through peer-to-peer networks.

Discovery revealed that billions of files are shared across peer-to-peer networks each month. Respondents are aware that users employ their software primarily to download copyrighted files, although the decentralized networks do not reveal which files are copied, and when. Respondents have sometimes learned about the infringement directly when users have e-

mailed questions regarding copyrighted works, and respondents have replied with guidance. Respondents are not merely passive recipients of information about infringement. The record is replete with evidence that when they began to distribute their free software, each of them clearly voiced the objective that recipients use the software to download copyrighted works and took active steps to encourage infringement. After the notorious file-sharing service, Napster, was sued by copyright holders for facilitating copyright infringement, both respondents promoted and marketed themselves as Napster alternatives. They receive no revenue from users, but, instead, generate income by selling advertising space, then streaming the advertising to their users. As the number of users increases, advertising opportunities are worth more. There is no evidence that either respondent made an effort to filter copyrighted material from users' downloads or otherwise to impede the sharing of copyrighted files.

The district court granted summary judgment in favor of Respondents.  The Ninth Circuit affirmed reading *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) as holding that the distribution of a commercial product capable of substantial noninfringing uses could not give rise to contributory liability for infringement unless the distributor had actual knowledge of specific instances of infringement and failed to act on that knowledge.  Because the appeals court found respondents' software to be capable of substantial noninfringing uses and because respondents had no actual knowledge of infringement owing to the software's decentralized architecture, the court held that they were not liable. It also held that they did not materially contribute to their users' infringement because the users themselves searched for, retrieved, and stored the infringing files, with no involvement by respondents beyond providing the software in the first place. Finally, the court held that respondents could not be held liable under a vicarious infringement theory because they did not monitor or control the software's use, had no agreed-

upon right or current ability to supervise its use, and had no independent duty to police infringement.

Held:  One who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, going beyond mere distribution with knowledge of third-party action, is liable for the resulting acts of infringement by third parties using the device, regardless of the device's lawful uses.

The Supreme Court vacated the judgement of the Ninth Circuit and remanded for further proceedings.

### B.  Circuit Courts of Appeal

*In re Aimster Copyright Litigation*, 334 F.3d 643, 651-53 (7th Cir. 2003):

Aimster is one of a number of enterprises (the former Napster is the best known) that have been sued for facilitating the swapping of digital copies of popular music, most of it copyrighted, over the Internet.

Teenagers and young adults who have access to the Internet like to swap computer files containing popular music. If the music is copyrighted, such swapping, which involves making and transmitting a digital copy of the music, infringes copyright. The swappers, who are ignorant or more commonly disdainful of copyright and in any event discount the likelihood of being sued or prosecuted for copyright infringement, are the direct infringers. But firms that facilitate their infringement, even if they are not themselves infringers because they are not making copies of the music that is shared, may be liable to the copyright owners as contributory infringers. Recognizing the impracticability or futility of a copyright owner's suing a multitude of individual infringers ("chasing individual consumers is time consuming and is a teaspoon solution to an ocean problem," Randal C. Picker, "Copyright as Entry Policy: The Case of Digital

Distribution," 47 Antitrust Bull. 423, 442 (2002)), the law allows a copyright holder to sue a contributor to the infringement instead, in effect as an aider and abettor. Another analogy is to the tort of intentional interference with contract, that is, inducing a breach of contract. See, e.g., Sufrin v. Hosier, 128 F.3d 594, 597 (7th Cir. 1997). If a breach of contract (and a copyright license is just a type of contract) can be prevented most effectively by actions taken by a third party, it makes sense to have a legal mechanism for placing liability for the consequences of the breach on him as well as on the party that broke the contract.

The district judge ruled that the recording industry had demonstrated a likelihood of prevailing on the merits should the case proceed to trial. He so ruled with respect to vicarious as well as contributory infringement.

The Aimster system has the following essential components: proprietary software that can be downloaded free of charge from Aimster's Web site; Aimster's server (a server is a computer that provides services to other computers, in this case personal computers owned or accessed by Aimster's users, over a network), which hosts the Web site and collects and organizes information obtained from the users but does not make copies of the swapped files themselves and that also provides the matching service described below; computerized tutorials instructing users of the software on how to use it for swapping computer files; and "Club Aimster," a related Internet service owned by Deep that users of Aimster's software can join for a fee and use to download the "top 40" popular-music files more easily than by using the basic, free service. The "AIM" in "Aimster" stands for AOL instant-messaging service. Aimster is available only to users of such services (of which AOL's is the most popular) because Aimster users can swap files only when both are online and connected in a chat room enabled by an instant-messaging service.

The *Aimster* court stated at 650-651:

> We also reject Aimster's argument that because the Court said in
> Sony that mere "constructive knowledge" of infringing uses is not enough
> for contributory infringement, 464 U.S. at 439, 104 S.Ct. 774, and the
> encryption feature of Aimster's service prevented Deep from knowing what
> songs were being copied by the users of his system, he lacked the
> knowledge of infringing uses that liability for contributory infringement
> requires. Willful blindness is knowledge, in copyright law (where indeed it
> may be enough that the defendant should have known of the direct
> infringement, Casella v. Morris, 820 F.2d 362, 365 (11th Cir. 1987); 2
> Goldstein, supra, § 6.1, p. 6:6), as it is in the law generally. See, e.g., Louis
> Vuitton S.A. v. Lee, 875 F.2d 584, 590 (7th Cir. 1989) (contributory
> trademark infringement). One who, knowing or strongly suspecting that he
> is involved in shady dealings, takes steps to make sure that he does not
> acquire full or exact knowledge of the nature and extent of those dealings is
> held to have a criminal intent, United States v. Giovannetti, 919 F.2d 1223,
> 1228 (7th Cir. 1990), because a deliberate effort to avoid guilty knowledge
> is all that the law requires to establish a guilty state of mind. United States
> v. Josefik, 753 F.2d 585, 589 (7th Cir. 1985); AMPAT/Midwest, Inc. v.
> Illinois Tool Works Inc., 896 F.2d 1035, 1042 (7th Cir. 1990) ("to know,
> and to want not to know because one suspects, may be, if not the same state
> of mind, the same degree of fault)." In United States v. Diaz, 864 F.2d 544,
> 550 (7th Cir. 1988), the defendant, a drug trafficker, sought "to insulate

himself from the actual drug transaction so that he could deny knowledge of it," which he did sometimes by absenting himself from the scene of the actual delivery and sometimes by pretending to be fussing under the hood of his car. He did not escape liability by this maneuver; no more can Deep by using encryption software to prevent himself from learning what surely he strongly suspects to be the case: that the users of his service--maybe all the users of his service--are copyright infringers.

This is not to say that the provider of an encrypted instant-messaging service or encryption software is ipso factor a contributory infringer should his buyers use the service to infringe copyright, merely because encryption, like secrecy generally, facilitates unlawful transactions. ("Encryption" comes from the Greek word for concealment.) Encryption fosters privacy, and privacy is a social benefit though also a source of social costs. "AOL has begun testing an encrypted version of AIM [AOL Instant Messaging]. Encryption is considered critical for widespread adoption of IM in some industries and federal agencies." Vise, supra. Our point is only that a service provider that would otherwise be a contributory infringer does not obtain immunity by using encryption to shield itself from actual knowledge of the unlawful purposes for which the service is being used.

We also do not buy Aimster's argument that since the Supreme Court distinguished, in the long passage from the Sony opinion that we quoted earlier, between actual and potential noninfringing uses, all Aimster has to show in order to escape liability for contributory infringement is that its

file-sharing system could be used in noninfringing ways, which obviously it

could be. Were that the law, the seller of a product or service used solely to

facilitate copyright infringement, though it was capable in principle of

noninfringing uses, would be immune from liability for contributory

infringement. That would be an extreme result, and one not envisaged by

the Sony majority. Otherwise its opinion would have had no occasion to

emphasize the fact (at least the majority thought it a fact--the dissent

disagreed, 464 U.S. at 458-59, 104 S.Ct. 774) that Sony had not in its

advertising encouraged the use of the Betamax to infringe copyright. Id. at

438, 104 S.Ct. 774. Nor would the Court have thought it important to say

that the Betamax was used "principally" for time shifting, id. at 421, 104

S.Ct. 774; see also id. at 423, 104 S.Ct. 774, which as we recall the Court

deemed a fair use, or to remark that the plaintiffs owned only a small

percentage of the total amount of copyrighted television programming and

it was unclear how many of the other owners objected to home taping. Id. at

443, 104 S.Ct. 774; see also id. at 446, 104 S.Ct. 774.

The Seventh Circuit affirmed as to contributory infringement.

*Columbia Pictures Industries, Inc. v. Fung*, 710 F.3d 1020, 96 U.S.P.Q.2d 1620 (9th

Cir. 2013):

Various film studios alleged that the services offered and websites maintained by

Appellants Gary Fung and his company, isoHunt Web Technologies, Inc. (isohunt.com,

torrentbox.com, podtropolis.com, and ed2k-it.com, collectively referred to in this opinion as "

Fung" or the " Fung sites" ) induced third parties to download infringing copies of the studios'

copyrighted works. The district court agreed, holding that the undisputed facts establish that Fung is liable for contributory copyright infringement.

The Fung sites have two primary methods of acquiring torrent files: soliciting them from users, who then upload the files; and using several automated processes (called " bots," " crawlers," or " spiders") that collect torrent files from other torrent sites. Because of this latter route, which other torrent sites also routinely use, torrent sites tend to have largely overlapping collections of torrents. According to a declaration Fung signed in April 2008, there were then over 400 torrent sites. Because the torrent sites typically contain only torrent files, no copyrighted material resides on these sites.

Lastly, the publisher leaves her computer on and connected to the Internet, with her BitTorrent program running. The publisher's job is essentially done; her computer will continue to communicate with the tracker assigned to the torrent file she uploaded, standing ready to distribute the movie file (or, more accurately, parts thereof) to others upon request.

A user seeking the uploaded movie now goes to the torrent site to which the torrent file was uploaded and runs a search for the movie. The search results then provide the torrent file for the user to download. Once the user downloads the torrent file and opens it with his BitTorrent program, the program reads the torrent file, learns the address of the tracker, and contacts it. The program then informs the tracker that it is looking for the movie associated with the downloaded torrent file and asks if there are any peers online that have the movie available for download. Assuming that publishers of that movie are online, the tracker will communicate their address to the user's BitTorrent program. The user's BitTorrent program will then contact the publishers' computers directly and begin downloading the pieces of the movie. At this point, the various publishers are known as " seeders," and the downloading user a " leecher." Once the leecher has

downloaded one or more pieces of the movie, he, too, can be a seeder by sending other leechers the pieces that he has downloaded.

The *Columbia* court stated at 1031-32:

> The "inducement" theory, on which the district court's liability holding was grounded, was spelled out in the Internet technology context by the Supreme Court in Grokster III Considering how to apply copyright law to file sharing over P2P networks, Grokster III addressed the circumstances in which individuals and companies are secondarily liable for the copyright infringement of others using the Internet to download protected material.

> Grokster III 's inducement holding is best understood by first backtracking to Sony Corp. of America v. Universal City Studios, Inc., 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984), the seminal Supreme Court case concerning the use of new technologies to reproduce copyrighted material. Sony considered whether secondary liability for infringement could arise solely from the distribution of a commercial product capable of copying copyrighted material— there, the Betamax video tape recorder, made by Sony. Owners of copyrights to television programs maintained that Sony could be liable for copyright infringement when its customers used the Betamax to unlawfully tape television shows. There was no evidence that Sony sought to encourage copyright infringement through use of the Betamax or had taken steps to profit from unlawful taping. See id. at 437-38, 104 S.Ct. 774. Instead, the only conceivable basis for secondary liability was distribution of the product " with constructive knowledge of the fact

that [Sony's] customers may use that equipment to make unauthorized copies of copyrighted material." Id. at 439, 104 S.Ct. 774.

Finding " no precedent in the law of copyright for the imposition of vicarious liability on such a theory," the Court borrowed from the " closest analogy" it could find, patent law's " staple article of commerce doctrine." Id. at 439-42, 104 S.Ct. 774. Under that doctrine, distribution of a component part of a patented device will not violate the patent if the component is suitable for substantial non-infringing uses. See id. at 440, 104 S.Ct. 774; 35 U.S.C. § 271(c). As Sony explained, the staple article of commerce doctrine balances competing interests, a copyright holder's legitimate demand for effective— not merely symbolic— protection of the statutory monopoly, and the rights of others freely to engage in substantially unrelated areas of commerce. Accordingly, the sale of copying equipment, like the sale of other articles of commerce, does not constitute contributory infringement if the product is widely used for legitimate, unobjectionable purposes. Indeed, it need merely be capable of substantial noninfringing uses.

464 U.S. at 442, 104 S.Ct. 774. As the Betamax was " capable of commercially significant noninfringing uses," the Court held Sony not liable for contributory copyright infringement.[12] Id.

The other major Supreme Court case addressing the mass copying of copyrighted material— there, music and films—through technological means, Grokster III, concerned the use of software applications based on "

pure" and " hybrid" P2P network protocols. The defendants, the providers of the copying software to the public, argued for a contributory liability approach similar to that adopted in Sony: as their products were indisputably capable of substantial noninfringing uses, they maintained, they could not be secondarily liable based on their knowledge that their products could be used to infringe copyrights. Instead, the Grokster defendants suggested, they could be liable for contributory infringement only if they had actual knowledge of a specific infringement at a time when they were capable of preventing it. Accepting this theory and recognizing that there was no evidence regarding timely knowledge of specific acts of infringement, the district court granted summary judgment to the defendants, Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd. (" Grokster I " ), 259 F.Supp.2d 1029, 1046 (C.D.Cal.2003), and we affirmed, Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd. (" Grokster II " ), 380 F.3d 1154, 1167 (9th Cir.2004).

The Supreme Court did not see Sony as providing such broad insulation from copyright liability. Rather, said the Court, Sony limits imputing culpable intent as a matter of law from the characteristics or uses of a distributed product. But nothing in Sony requires courts to ignore evidence of intent if there is such evidence, and the case was never meant to foreclose rules of fault-based liability derived from the common law. Grokster III, 545 U.S. at 934-35, 125 S.Ct. 2764 (emphasis added). The " staple article of commerce doctrine" adopted in Sony, Grokster III

explained, " absolves the equivocal conduct of selling an item with substantial lawful as well as unlawful uses, and limits liability to instances of more acute fault than the mere understanding that some of one's products will be misused." Id. at 932-33, 125 S.Ct. 2764 (emphasis added). " Thus, where evidence goes beyond a product's characteristics or the knowledge that it may be put to infringing uses, and shows statements or actions directed to promoting infringement, Sony 's staple-article rule will not preclude liability." Id. at 935, 125 S.Ct. 2764.

Grokster III went on to enunciate the " inducement rule," also borrowed from patent law, providing that " one who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties." Id. at 936-37, 125 S.Ct. 2764. This inducement principle, as enunciated in Grokster III, has four elements: (1) the distribution of a device or product, (2) acts of infringement, (3) an object of promoting its use to infringe copyright, and (4) causation. See id.

The Ninth Circuit affirmed the district court's grant of summary judgment to Plaintiffs on liability.

*A&M Records v. Napster*, 239 F.3d 1004, 57 U.S.P.Q.2d 1729 (9th Cir. 2001):

Plaintiffs are engaged in the commercial recording, distribution and sale of copyrighted musical compositions and sound recordings. The complaint alleges that Napster, Inc. ("Napster") is a contributory and vicarious copyright infringer. On July 26, 2000, the district court granted

plaintiffs' motion for a preliminary injunction. The injunction was slightly modified by written opinion on August 10, 2000. A&M Records, Inc. v. Napster, Inc., 114 F.Supp.2d 896 (N.D. Cal. 2000). The district court preliminarily enjoined Napster "from engaging in, or facilitating others in copying, downloading, uploading, transmitting, or distributing plaintiffs' copyrighted musical compositions and sound recordings, protected by either federal or state law, without express permission of the rights owner." Id. at 927.

In 1987, the Moving Picture Experts Group set a standard file format for the storage of audio recordings in a digital format called MPEG-3, abbreviated as "MP3." Digital MP3 files are created through a process colloquially called "ripping." Ripping software allows a computer owner to copy an audio compact disk ("audio CD") directly onto a computer's hard drive by compressing the audio information on the CD into the MP3 format. The MP3's compressed format allows for rapid transmission of digital audio files from one computer to another by electronic mail or any other file transfer protocol.

Napster facilitates the transmission of MP3 files between and among its users. Through a process commonly called "peer-to-peer" file sharing, Napster allows its users to: (1) make MP3 music files stored on individual computer hard drives available for copying by other Napster users; (2) search for MP3 music files stored on other users' computers; and (3) transfer exact copies of the contents of other users' MP3 files from one computer to another via the Internet. These functions are made possible by Napster's MusicShare software, available free of charge from Napster's Internet site, and Napster's network servers and server-side software. Napster provides technical support for the indexing and searching of MP3 files, as well as for its other functions, including a "chat room," where users can meet to discuss music, and a directory where participating artists can provide information about their music.

The *Napster* court stated at 1020-23:

A. Knowledge

Contributory liability requires that the secondary infringer "know or have reason to know" of direct infringement. Cable/ Home Communication Corp. Network Prods., Inc., 902 F.2d 829, 845 & 846 n.29 (11th Cir. 1990); Religious Tech. Ctr. v. Netcom On-Line Communication Servs., Inc., 907 F. Supp. 1361, 1373-74 (N.D. Cal. 1995) (framing issue as "whether Netcom knew or should have known of" the infringing activities). The district court found that Napster had both actual and constructive knowledge that its users exchanged copyrighted music. The district court also concluded that the law does not require knowledge of "specific acts of infringement" and rejected Napster's contention that because the company cannot distinguish infringing from noninfringing files, it does not "know" of the direct infringement. 114 F.Supp.2d at 917.

It is apparent from the record that Napster has knowledge, both actual and constructive,(FN5) of direct infringement. Napster claims that it is nevertheless protected from contributory liability by the teaching of Sony Corp. v. Universal City Studios, Inc., 464 U.S. 417 (1984). We disagree. We observe that Napster's actual, specific knowledge of direct infringement renders Sony's holding of limited assistance to Napster. We are compelled to make a clear distinction between the architecture of the Napster system and Napster's conduct in relation to the operational capacity of the system.

The Sony Court refused to hold the manufacturer and retailers of video tape recorders liable for contributory infringement despite evidence that such machines could be and were used to infringe plaintiffs' copyrighted television shows. Sony stated that if liability "is to be imposed on petitioners in this case, it must rest on the fact that they have sold equipment with constructive knowledge of the fact that their customers may use that equipment to make unauthorized copies of copyrighted material." Id. at 439 (emphasis added). The Sony Court declined to impute the requisite level of knowledge where the defendants made and sold equipment capable of both infringing and "substantial noninfringing uses." Id. at 442 (adopting a modified "staple article of commerce" doctrine from patent law). See also Universal City Studios, Inc. v. Sony Corp., 480 F. Supp. 429, 459 (C.D. Cal. 1979) ("This court agrees with defendants that their knowledge was insufficient to make them contributory infringers."), rev'd, 659 F.2d 963 (9th Cir. 1981), rev'd, 464 U.S. 417 (1984); Alfred C. Yen, Internet Service Provider Liability for Subscriber Copyright Infringement, Enterprise Liability, and the First Amendment, 88 Geo. L.J. 1833, 1874 & 1893 n.210 (2000) (suggesting that, after Sony, most Internet service providers lack "the requisite level of knowledge" for the imposition of contributory liability).

We are bound to follow Sony, and will not impute the requisite level of knowledge to Napster merely because peer-to-peer file sharing technology may be used to infringe plaintiffs' copyrights. See 464 U.S. at

436 (rejecting argument that merely supplying the " `means' to accomplish an infringing activity" leads to imposition of liability). We depart from the reasoning of the district court that Napster failed to demonstrate that its system is capable of commercially significant noninfringing uses. See Napster, 114 F.Supp.2d at 916, 91718. The district court improperly confined the use analysis to current uses, ignoring the system's capabilities. See generally Sony, 464 U.S. at 442-43 (framing inquiry as whether the video tape recorder is "capable of commercially significant noninfringing uses") (emphasis added). Consequently, the district court placed undue weight on the proportion of current infringing use as compared to current and future noninfringing use. See generally Vault Corp. v. Quaid Software Ltd., 847 F.2d 255, 264-67 (5th Cir. 1997) (single noninfringing use implicated Sony). Nonetheless, whether we might arrive at a different result is not the issue here. See Sports Form, Inc. v. United Press Int'l, Inc., 686 F.2d 750, 752 (9th Cir. 1982). The instant appeal occurs at an early point in the proceedings and "the fully developed factual record may be materially different from that initially before the district court...." Id. at 753. Regardless of the number of Napster's infringing versus noninfringing uses, the evidentiary record here supported the district court's finding that plaintiffs would likely prevail in establishing that Napster knew or had reason to know of its users' infringement of plaintiffs' copyrights.

This analysis is similar to that of Religious Technology Center v. Netcom On-Line Communication Services, Inc., which suggests that in an

online context, evidence of actual knowledge of specific acts of infringement is required to hold a computer system operator liable for contributory copyright infringement. 907 F. Supp. at 1371. Netcom considered the potential contributory copyright liability of a computer bulletin board operator whose system supported the posting of infringing material. Id. at 1374. The court, in denying Netcom's motion for summary judgment of noninfringement and plaintiff's motion for judgment on the pleadings, found that a disputed issue of fact existed as to whether the operator had sufficient knowledge of infringing activity. Id. at 1374-75.

The court determined that for the operator to have sufficient knowledge, the copyright holder must "provide the necessary documentation to show there is likely infringement." 907 F. Supp. at 1374; cf. Cubby, Inc. v. Compuserve, Inc., 776 F. Supp. 135, 141 (S.D.N.Y. 1991) (recognizing that online service provider does not and cannot examine every hyperlink for potentially defamatory material). If such documentation was provided, the court reasoned that Netcom would be liable for contributory infringement because its failure to remove the material "and thereby stop an infringing copy from being distributed worldwide constitutes substantial participation" in distribution of copyrighted material. Id.

We agree that if a computer system operator learns of specific infringing material available on his system and fails to purge such material from the system, the operator knows of and contributes to direct infringement. See Netcom, 907 F. Supp. at 1374. Conversely, absent any

specific information which identifies infringing activity, a computer system operator cannot be liable for contributory infringement merely because the structure of the system allows for the exchange of copyrighted material. See Sony, 464 U.S. at 436, 442-43. To enjoin simply because a computer network allows for infringing use would, in our opinion, violate Sony and potentially restrict activity unrelated to infringing use.

We nevertheless conclude that sufficient knowledge exists to impose contributory liability when linked to demonstrated infringing use of the Napster system. See Napster, 114 F.Supp.2d at 919 ("Religious Technology Center would not mandate a determination that Napster, Inc. lacks the knowledge requisite to contributory infringement."). The record supports the district court's finding that Napster has actual knowledge that specific infringing material is available using its system, that it could block access to the system by suppliers of the infringing material, and that it failed to remove the material. See Napster, 114 F.Supp.2d at 918, 920-21. (FN6)

B. Material Contribution

Under the facts as found by the district court, Napster materially contributes to the infringing activity. Relying on Fonovisa, the district court concluded that"[w]ithout the support services defendant provides, Napster users could not find and download the music they want with the ease of which defendant boasts." Napster, 114 F.Supp.2d at 919-20 ("Napster is an integrated service designed to enable users to locate and download MP3 music files."). We agree that Napster provides "the site and facilities" for

direct infringement. See Fonovisa, 76 F.3d at 264; cf. Netcom, 907 F. Supp.

at 1372 ("Netcom will be liable for contributory infringement since its

failure to cancel [a user's] infringing message and thereby stop an infringing

copy from being distributed worldwide constitutes substantial

participation."). The district court correctly applied the reasoning in

*Fonovisa*, and properly found that Napster materially contributes to direct

infringement.

The Ninth Circuit affirmed the district court's conclusion that plaintiffs have demonstrated a

likelihood of success on the merits of the contributory copyright infringement claim.

***BMG Rights Management (U.S.) LLC v. Cox Communications, Inc***., 881 F.3d 293 (4th

Cir. 2018):

MG Rights Management (U.S.) LLC (" BMG), which owns copyrights in musical

compositions, filed this suit alleging copyright infringement against Cox Communications, Inc.

and CoxCom, LLC (collectively, " Cox"), providers of high-speed Internet access. BMG seeks to

hold Cox contributorily liable for infringement of BMG's copyrights by subscribers to Cox's

Internet service.

Cox is a conduit Internet service provider (" ISP"), providing approximately 4.5 million

subscribers with high-speed Internet access for a monthly fee. Some of Cox's subscribers shared

and received copyrighted files, including music files, using a technology known as BitTorrent.

BitTorrent is not a software program, but rather describes a protocol— a set of rules governing

the communication between computers— ***that*** allows individual computers on the Internet to

transfer files directly to other computers. This method of file sharing is commonly known as "

peer-to-peer" file sharing, and contrasts with the traditional method of downloading a file from a central server using a Web browser.

Although peer-to-peer file sharing is not new, what makes BitTorrent unique is that it allows a user to download a file from multiple peers at the same time— even peers who only have a piece of the file, rather than the complete file. In other words, as soon as a user has downloaded a piece of the file, he or she can begin sharing that piece with others (while continuing to download the rest of the file). This innovation makes sharing via BitTorrent particularly fast and efficient. Although BitTorrent can be used to share any type of digital file, many use it to share copyrighted music and video files without authorization.

As a conduit ISP, Cox only provides Internet access to its subscribers. Cox does not create or sell software that operates using the BitTorrent protocol, store copyright-infringing material on its own computer servers, or control what its subscribers store on their personal computers.

The case proceeded to a jury trial that involved the testimony of more than a dozen witnesses and admission of numerous documents. At the conclusion of the trial, the district court instructed the jury that to prove contributory infringement, BMG had to show " direct infringement of BMG's copyrighted works" by Cox subscribers, that " Cox knew or should have known of such infringing activity," and that " Cox induced, caused, or materially contributed to such infringing activity." The court further instructed the jury that BMG could prove Cox's knowledge of infringing activity by showing willful blindness, if Cox " was aware of a high probability that Cox users were infringing BMG's copyrights but consciously avoided confirming that fact."

The jury found Cox liable for willful contributory infringement and awarded BMG $25 million in statutory damages. The jury also found that Cox was not liable for vicarious infringement. The district court denied all post-trial motions and entered judgment in accordance with the verdict. Cox appeals, arguing that BMG should not have been granted summary judgment as to the DMCA safe harbor and that erroneous jury instructions entitle it to a new trial.

The *BMG* court stated at 305-311:

A.

Cox's initial jury instruction argument rests on its contention that it cannot be held liable for contributory copyright infringement because its technology is " capable of substantial noninfringing use." Appellants Br. at 15, 38. According to Cox, the district court erred in refusing " to instruct the jury on this principle." Id. at 15.

This argument is meritless. Of course, the mere sale of a product that has both lawful and unlawful uses does not in and of itself establish an intent to infringe. That is the holding of Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984). In Sony, copyright holders sought to hold Sony contributorily liable for selling video cassette recorders (VCRs) that customers used to tape copyrighted programs. Id. at 419-20, 104 S.Ct. 774. The Supreme Court rejected that claim, holding that because a VCR was " capable of commercially significant noninfringing uses," its manufacturer, Sony, could not be held contributory liable for distribution of the VCR. Id. at 442, 104 S.Ct. 774.

A few courts initially interpreted Sony 's limitation, as Cox does, to mean that if a product can be substantially used lawfully, its producer cannot be contributorily liable for

copyright infringement. See, e.g., Metro-Goldwyn-Mayer Studios, Inc. v. Grokster Ltd., 380 F.3d 1154, 1162 (9th Cir. 2004), vacated and remanded, 545 U.S. 913, 125 S.Ct. 2764, 162 L.Ed.2d 781 (2005); Vault Corp. v. Quaid Software Ltd., 847 F.2d 255, 262, 267 (5th Cir. 1988). But in Grokster, the Supreme Court rejected this broad reading. See Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd., 545 U.S. 913, 125 S.Ct. 2764, 162 L.Ed.2d 781 (2005). The Court clarified that " Sony barred secondary liability based on presuming or imputing intent to cause infringement solely from the design or distribution of a product capable of substantial lawful use, which the distributor knows is in fact used for infringement." Id. at 933, 125 S.Ct. 2764 (emphasis added). The Grokster Court explained that under Sony, intent to infringe will not be presumed from " the equivocal conduct of selling an item with substantial lawful as well as unlawful uses," even when the seller has the " understanding that some of [his or her] products will be misused." Id. at 932-33, 125 S.Ct. 2764. More is needed. But the fact that a product is " capable of substantial lawful use" does not mean the " producer can never be held contributorily liable." Id. at 934, 125 S.Ct. 2764.

Exactly the same flaw infects Cox's related argument that the district court erred in refusing to instruct the jury that " [i]t is not a material contribution to provide a product or service that is capable of substantial non-infringing uses." Appellants Br. 22-23. As the Supreme Court explained, reversal was required in Grokster because the Ninth Circuit had " read Sony's limitation to mean that whenever a product is capable of substantial lawful use, the producer can never be held contributorily liable for third parties' infringing use of it .... [t]his view of Sony, however, was error." Grokster, 545 U.S. at 934, 125 S.Ct. 2764.

Because the instruction Cox requested misstates the law, the district court did not err in refusing to give it. See United States v. Smoot, 690 F.3d 215, 223 (4th Cir. 2012). In fact, providing a product with " substantial non-infringing uses" can constitute a material contribution to copyright infringement. See, e.g., Perfect 10, Inc. v. Amazon.com, Inc., 508 F.3d 1146, 1172 (9th Cir. 2007) (holding that Google's image search engine " substantially assists websites to distribute their infringing copies" of copyrighted images, and thus constitutes a material contribution, even though " Google's assistance is available to all websites, not just infringing ones"). Grokster makes clear that what matters is not simply whether the product has some or even many non-infringing uses, but whether the product is distributed with the intent to cause copyright infringement. See Grokster, 545 U.S. at 934, 125 S.Ct. 2764 (" Sony's rule limits imputing culpable in tent as a matter of law from the characteristics or uses of a distributed product." (emphasis added)).

Thus, contrary to Cox's argument, the fact that its technology can be substantially employed for a noninfringing use does not immunize it from liability for contributory copyright infringement. The district court did not err in refusing to instruct the jury to the contrary.

B.

Alternatively, Cox offers a more nuanced attack on the contributory infringement instructions. Cox contends that the court erred in charging the jury as to the intent necessary to prove contributory infringement. Specifically, Cox challenges the district court's instructions that the jury could impose liability for contributory infringement if

the jury found " Cox knew or should have known of such infringing activity." We agree

that in so instructing the jury, the court erred.

     i.

    Grokster teaches that " [o]ne infringes contributorily by intentionally inducing or

encouraging direct infringement." 545 U.S. at 930, 125 S.Ct. 2764 (emphasis added). The

requisite intent may, however, be presumed according to the " rules of fault-based

liability derived from the common law." Id. at 934-35, 125 S.Ct. 2764. The most relevant

of these common law rules is that if a person " knows that the consequences are certain,

or substantially certain, to result from his act, and still goes ahead, he is treated by the law

as if he had in fact desired to produce the result." See Restatement (Second) of Torts §

8A cmt. b (1965); Grokster, 545 U.S. at 932, 125 S.Ct. 2764 (a person " will be presumed

to intend the natural consequences of his acts" (internal quotation marks and citation

omitted)). Under this principle, " when an article is good for nothing else but

infringement ... there is no injustice in presuming or imputing an intent to infringe" based

on its sale. Grokster, 545 U.S. at 932, 125 S.Ct. 2764 (internal quotation marks and

citation omitted). Assuming the seller is aware of the nature of his product— that its only

use is infringing— he knows that infringement is substantially certain to result from his

sale of that product and he may therefore be presumed to intend that result.

    A similar result follows when a person sells a product that has lawful uses, but with

the knowledge that the buyer will in fact use the product to infringe copyrights. In that

circumstance, the seller knows that infringement is substantially certain to result from the

sale; consequently, the seller intends to cause infringement just as much as a seller who

provides a product that has exclusively unlawful uses. See Henry v. A.B. Dick Co., 224

U.S. 1, 32 S.Ct. 364, 56 L.Ed. 645 (1912), overruled on other grounds, Motion Picture

Patents Co. v. Universal Film Mfg. Co., 243 U.S. 502, 37 S.Ct. 416, 61 L.Ed. 871 (1917).

Indeed, Henry, a hundred-year-old Supreme Court case involving contributory patent

infringement that the Supreme Court cited in Grokster, 545 U.S. at 932-33, 935, 125

S.Ct. 2764, and Sony, 464 U.S. at 441-42, 104 S.Ct. 774, rests on this very reasoning.

There, the Court affirmed a judgment for contributory infringement based on the

defendants' sale to a specific person with knowledge that the product would be used to

infringe, even though the product— ink— also had noninfringing uses. Henry, 224 U.S.

at 48-49, 32 S.Ct. 364. The Court reasoned that because the defendants sold the ink "

with the expectation that it would be used" to infringe, " the purpose and intent that it

would be so used" could be presumed. Id. at 49, 32 S.Ct. 364. 881 F.3d 308

 These principles apply equally in cases, like this one, that involve subscription

services or rentals rather than one-time sales. Consider a company that leases VCRs,

learns that specific customers use their VCRs to infringe, but nonetheless renews the

lease to those infringing customers. Given those facts, the company knows that its

action— renewing the lease of the VCR to these specific customers— is substantially

certain to result in infringement, and so an intent to cause infringement may be presumed.

See Amazon.com, 508 F.3d at 1172 (explaining that " intent may be imputed" based on "

a service provider's knowing failure to prevent infringing actions.")

 It is well-established that one mental state slightly less demanding than actual

knowledge— willful blindness— can establish the requisite intent for contributory

copyright infringement. This is so because the law recognizes willful blindness as

equivalent to actual knowledge. See Global-Tech Appliances, Inc. v. SEB S.A., 563 U.S.

754, 766, 131 S.Ct. 2060, 179 L.Ed.2d 1167 (2011) (" [P]ersons who know enough to

blind themselves to direct proof of critical facts in effect have actual knowledge of those

facts." ); Aimster, 334 F.3d at 650 (" Willful blindness is knowledge, in copyright law ...

as it is in the law generally." ).

Whether other mental states— such as negligence (where a defendant " should have

known" of infringement)— can suffice to prove contributory copyright infringement

presents a more difficult question. [4] The notion that contributory liability could be

imposed based on something less than actual knowledge, or its equivalent, willful

blindness, is not entirely without support. See Aimster, 334 F.3d at 650 (" [I]n copyright

law ... indeed it may be enough that the defendant should have known of the direct

infringement ....") Nonetheless, we believe for several reasons, that, as Cox contends,

negligence does not suffice to prove contributory infringement; rather, at least willful

blindness is required.

First, Grokster 's recitation of the standard— that " [o]ne infringes contributorily by

intentionally inducing or encouraging direct infringement" — is on its face difficult to

reconcile with a negligence standard. See 545 U.S. at 930, 125 S.Ct. 2764 (emphasis

added). In addition, it would have been unnecessary for the Court to discuss in detail the

situations in which intent may be presumed, and those situations, like Sony, in which it

may not, if liability did not require intent at all, but merely required negligence. See id. at

934, 125 S.Ct. 2764.

Looking to patent law, as the Supreme Court did in Sony and Grokster, further

counsels against a negligence standard. The Supreme Court has long held that

contributory patent infringement requires knowledge of direct infringement. Aro Mfg.

Co. v. Convertible Top Replacement Co., 377 U.S. 476, 488, 84 S.Ct. 1526, 12 L.Ed.2d 457 (1964). And in 2011, the Court held that willful blindness satisfies this knowledge requirement, but recklessness (" one who merely knows of a substantial and unjustified risk of ... wrongdoing") and negligence (" one who should have known of a similar risk but, in fact, did not") do not. Global-Tech, 563 U.S. at 769-71, 131 S.Ct. 2060. The Court reaffirmed this holding in 2015, stating that contributory patent infringement " requires proof the defendant knew the acts were infringing," and that Global-Tech " was clear in rejecting any lesser mental state as the standard." Commil USA, LLC v. Cisco Sys., Inc., __ U.S. __, 135 S.Ct. 1920, 1928, 191 L.Ed.2d 883 (2015). The Court expressly rejected the possibility " that a person, or entity, could be liable even though he did not know the acts were infringing." Id. Thus, in the patent context, it is clear that contributory infringement cannot be based on a finding that a defendant " should have known" of infringement.

In both Grokster and Sony, the Supreme Court adopted now-codified patent law doctrines— the staple article doctrine and the inducement rule. The Court did so because of " the historic kinship between patent law and copyright law," Sony, 464 U.S. at 439-42, 104 S.Ct. 774, and the similar need in both contexts to impose liability on " culpable expression and conduct" without " discouraging the development of technologies with lawful and unlawful potential," Grokster, 545 U.S. at 936-37, 125 S.Ct. 2764. We are persuaded that the Global-Tech rule developed in the patent law context, which held that contributory liability can be based on willful blindness but not on recklessness or negligence, is a sensible one in the copyright context. It appropriately targets culpable conduct without unduly burdening technological development. [5]

The law of aiding and abetting, " the criminal counterpart to contributory infringement," Aimster, 334 F.3d at 651, similarly militates against adoption of a negligence standard. A person " aids and abets a crime when ... he intends to facilitate that offense's commission." Rosemond v. United States, __ U.S. __, 134 S.Ct. 1240, 1248, 188 L.Ed.2d 248 (2014). The necessary intent can be presumed only " when a person actively participates in a criminal venture with full knowledge of the circumstances constituting the charged offense." Id. at 1248-49 (emphasis added).

Furthermore, " [t]he Restatement of Torts, under a concert of action principle, accepts a doctrine with rough similarity to criminal aiding and abetting," and therefore provides another analog to contributory infringement. See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 181, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). " An actor is liable for harm resulting to a third person from the tortious conduct of another 'if he knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other.' " Id. (quoting Restatement (Second) of Torts § 876(b) (1977)) (emphasis added). Because the Restatement here uses only the word " knows," where in other places it uses phrases like " knows or should know," it is clear that " knows" here refers to actual knowledge, not any lesser mental state. Compare Restatement (Second) of Torts § 876(b) with § 336 (" knows or has reason to know") and § 366 (" knows or should know"). And the Second Circuit's widely-cited Gershwin decision on contributory infringement expressly drew on precisely this " common law doctrine that one who knowingly participates or furthers a tortious act is jointly and severally liable with the prime tortfeasor." Gershwin Publ'g. Corp. v.

Columbia Artists Mgmt., Inc., 443 F.2d 1159, 1162 (2d Cir. 1971) (internal quotation marks and citation omitted) (emphasis added).

We therefore hold that proving contributory infringement requires proof of at least willful blindness; negligence is insufficient.

ii.

In arguing to the contrary, BMG relies on a pre-Grokster decision, Ellison v. Robertson, in which the Ninth Circuit stated that some of its precedents had " interpreted the knowledge requirement for contributory copyright infringement to include both those with actual knowledge and those who have reason to know of direct infringement." 357 F.3d 1072, 1076 (9th Cir. 2004). But the Ninth Circuit has since clarified, consistent with our holding today, that contributory infringement requires " actual knowledge of specific acts of infringement" or " [w]illful blindness of specific facts." Ludvarts, LLC v. AT&T Mobility, LLC, 710 F.3d 1068, 1072-73 (9th Cir. 2013) (internal quotation marks and citation omitted).

BMG also argues that " Sony itself described a case where the defendant 'knew or should have known' of the infringement as a " situation [] in which the imposition of [contributory] liability is manifestly just." Appellee Br. 44-45 (Appellee's alterations) (quoting Sony, 464 U.S. at 437-38, 437 n.18, 104 S.Ct. 774). BMG misreads Sony. The quoted sentence refers to vicarious liability, stating that imposing liability is " manifestly just" where the defendant can " control the use of copyrighted works by others," Sony, 464 U.S. at 437-38, 104 S.Ct. 774— which is an element of vicarious liability, but not of contributory infringement, see Grokster, 545 U.S. at 930 n.9, 125 S.Ct. 2764.

In a footnote to that sentence, Sony cited numerous lower court cases, including one in which the district court held that an infringer's advertising agency and similar defendants could be held contributorily liable if they " knew or should have known that they were dealing in illegal goods." 464 U.S. at 437 n.18, 104 S.Ct. 774 (citing Screen Gems-Columbia Music, Inc. v. Mark-Fi Records, Inc., 256 F. Supp. 399 (S.D.N.Y. 1966)). Although that district court used the phrase " knew or should have known," the allegation in that case was that the defendants were dealing with counterfeit musical records priced " so suspiciously below the usual market price" that the defendants must have known or " deliberately closed [their] eyes" to the fact that the records were infringing. Screen Gems-Columbia Music, 256 F. Supp. at 404. In such circumstances, liability could be imposed based on a theory of willful blindness, making it unnecessary to permit the imposition of liability based on a lesser negligence standard.

The Fourth Circuit followed the contributory infringement analysis of *Grokster.*  Due to an improper jury instruction as to the standard, the Fourth remanded on the issue of contributory infringement.

**Cobbler Nevada, LLC v. Gonzales***, 901 F.3d 1142 (9th Cir. 2018):

See the Court's Order to Show Cause.

### C.  District Courts

**Purzel Video GmbH v. Smoak**, 70 F. Supp.3d 1222, 1233-34 (2014):

The *Purzel* court stated:

In this case, Plaintiff has sufficiently alleged that Smoak copied its protected work by demonstrating, through verified testimony, that its investigator downloaded from Smoak's IP address a copy of the Hash 840D from the BitTorrent file distribution

network (accessed by Smoak) and confirmed through independent review that the file hash matched Plaintiff's copyrighted work. Plaintiff's investigator then verified that the downloaded file contained a " substantial portion" of Plaintiff's copyrighted film. Thus, Plaintiff contends that on or about February 5, 2013, Smoak installed BitTorrent client software onto a computer to serve as the interface during the downloading/uploading process, visited a torrent site that contained an index of files being made available by other users for copying and downloading, and using the BitTorrent protocol, Smoak then joined a BitTorrent swarm where he downloaded the copyrighted film from and uploaded the film to the other members of the swarm. Taking these well-pled allegations as true, the Court finds that Plaintiff has established that Smoak copied Plaintiff's copyright protected work and recommends that the District Court find Smoak has committed a direct infringement of the Copyright Act against Plaintiff as set forth in Count I of the Amended Complaint.

Plaintiff also asserts a claim for contributory infringement. Plaintiff alleges that Smoak participated in a BitTorrent " swarm" with other peers to cause the infringement of its copyrighted film by other Defendants and swarm members. Taking as true Plaintiff's allegations concerning Smoak's actual access to Hash 840D, the Court finds that he and at least one other Defendant accessed the file on the same date [see docket #21-3] and, thus, the allegations demonstrate a plausibility that Smoak participated with that Defendant in the same BitTorrent swarm. See Patrick Collins, Inc., 2013 WL 359759, at *2 (" to constitute a swarm, all of the peers must be sharing the same file (identified by its unique hash identifier))." Accordingly, the Court recommends that the

District Court find the Plaintiff has demonstrated Defendant Smoak's liability as to

contributory infringement as set forth in Count II of the Amended Complaint.

The district court entered judgment against the defendant for contributory infringement.

*Arista Records LLC v. Usenet.com, Inc.*, 91 U.S.P.Q.2d 1744, 633 F.Supp.2d 124

(S.D.N.Y 2009):

 The *Arista* court stated at 633 F. Supp.2d at 154:

### 2. Contributory Infringement

Contributory copyright infringement " is a form of secondary liability with roots in

tort-law concepts of enterprise liability and imputed intent." *Perfect 10, Inc. v. Visa Int'l*

*Serv. Ass'n*, 494 F.3d 788, 794-95 (9th Cir.2007), cert. denied, __ U.S. __, 128 S.Ct.

2871, 171 L.Ed.2d 811 (2008). A party is liable for contributory infringement if, " with

knowledge of the infringing activity," it " induces, causes, or materially contributes to the

infringing conduct of another." *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*,

443 F.2d 1159, 1162 (2d Cir.1971). The requisite knowledge for contributory

infringement liability may be actual or constructive. *Faulkner v. Nat'l Geographic Soc'y*,

211 F.Supp.2d 450, 474 (S.D.N.Y.2002), aff'd, Faulkner v. Nat'l Geographic Enters. Inc.,

409 F.3d 26 (2d Cir.2005); *A & M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1020

(9th Cir.2001) (" Contributory liability requires that the secondary infringer 'know or

have reason to know' of direct infringement."). Turning a " blind eye" to infringement

has also been found to be the equivalent of knowledge. *Aimster*, 334 F.3d at 650. Thus,

knowledge of specific infringements is not required to support a finding of contributory

infringement. See *Arista Records, Inc. v. Flea World, Inc.*, No. 03-2670(JBS), 2006 WL

842883, at *14, 2006 U.S. Dist. LEXIS 14988, at *47-48 (D.N.J. Mar. 31, 2006).

The district court granted summary in favor of plaintiff on its contributory infringement claim.


Dated:  February 4, 2019

DUREN IP


By: ____/s/Todd E. Zenger_____
     Todd E. Zenger

Attorneys for Plaintiff
CRIMINAL PRODUCTIONS, INC.

CERTIFICATE OF SERVICE

I hereby certify that on February 4, 2019 a true and correct copy of the foregoing

Brief 3 was duly filed with the Clerk of the Court, which caused service on all e-filers. In

addition, service by mail was made on the following by U.S. first class mail on February 4, 2019:


Troy    Regier         6232 S STERNWOOD DR    Taylorsville, UT 84129
Mike    Hudson         13521 S Muhlenburg Way    Riverton, UT 84065
Ricky   Baker  5       394 W 5200 S           Kearns, UT 84118
New     Roads Treatment        1530 S 500 W    Provo, UT 84601
Steve   Shaver         4019 S 4275 W          West Valley City, UT 84120
Derrick Martin         776 24TH ST UNIT WEST  Ogden, UT 84401
Sara    Palacios       141 W 200 N            Logan, UT 84321
Cynthia Delgado        105 GWEN ST            Ogden, UT 84404
Karen   Santarosa      12494 S 800 E          Draper, UT 84020
Marta   Torres         1663 W NORTHWOOD AVE APT 4       Salt Lake City, UT 84116
Terry   Shelby         14775 S HADDINGTON RD  Draper, UT 84020
Maria   Arredondo      3504 JEFFERSON AVE     Ogden, UT 84403


                              /s/ Seth F. Littleford